UNITED STATES BANKRUPTCY COURT  Not For Publication
SOUTHERN DISTRICT OF NEW YORK

_____

|                                      |   |                         |
|--------------------------------------|---|-------------------------|
| In re:                               | : | Chapter 11              |
|                                      | : |                         |
| ENRON CORP., *et al.*,               | : | Case No. 01 B 16034 (AJG) |
|                                      | : |                         |
|    Reorganized Debtors. | : | (Confirmed)             |
|                                      | : |                         |

_____:

|                                      |   |                         |
|--------------------------------------|---|-------------------------|
| ENRON POWER MARKETING, INC.,         | : |                         |
|                                      | : |                         |
|    Plaintiff,         | : |                         |
|                                      | : |                         |
|   v.                       | : | Adv. Pro. No. 04-2933   |
|                                      | : |                         |
| VIRGINIA ELECTRIC AND POWER CO., d/b/a | : |                       |
| DOMINION VIRGINIA POWER,             | : |                         |
|                                      | : |                         |
|    Defendant.         | : |                         |

_____:


OPINION DENYING PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL FOR VIRGINIA
ELECTRIC AND POWER COMPANY D/B/A DOMINION VIRGINIA POWER


A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP
Attorneys for Enron Power Marketing, Inc.,
767 Fifth Avenue
New York, New York  10153

   Peter Gruenberger, Esq.
   Martin J. Bienenstock, Esq.
     Of Counsel

200 Crescent Court, Suite 300
Dallas, Texas  75201

   Martin A. Sosland, Esq.
   Vance L. Beagles, Esq.
   Angela C. Zambrano, Esq.

Michelle Hartmann, Esq.
Of Counsel

TROUTMAN SANDERS LLP
Attorneys for Virginia Electric and Power Co.
d/b/a Dominion Virginia Power
1111 East Main Street
Richmond, Virginia 23218-1122

Russell V. Palmore, Jr., Esq.
Stephen A. Northup, Esq.
Bradfute W. Davenport, Jr., Esq.
Matthew B. Kirsner, Esq.
Of Counsel

LOWENSTEIN SANDLER, PC
Attorneys for Virginia Electric and Power Co.
d/b/a Dominion Virginia Power
1251 Avenue of the Americas, 18th Floor
New York, New York 10020

Michael S. Etkin, Esq.
Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

The issue before the Court is whether counsel for Virginia Electric and Power Co. d/b/a

Dominion Virginia Power ("VEPCO"), Troutman Sanders LLP ("Troutman"), should be

disqualified on the ground that (1) the prior representation of Enron Power Marketing, Inc.

("EPMI") and Richmond Power Enterprise, L.P., ("RPE"), an affiliate of EPMI (collectively,

"RPE/EPMI") by Mays & Valentine L.L.P. ("Mays"), the predecessor firm of Troutman

(collectively, "Troutman"), is substantially related to the present adversary proceeding brought

by EPMI against VEPCO (the "Proceeding"), (2) during its prior representation of RPE/EPMI,

Troutman had access or was likely to have had access to privileged information of EPMI, (3)

Troutman violated the advocate-witness disqualification rules in New York Code of Professional

Responsibility (the "NY Code"), and (4) Trouman failed to seek the consent from EPMI

concerning its representation of VEPCO. The Court finds that (1) EPMI has not met the high

standard required for disqualification to demonstrate that there exists a substantial relationship

between Troutman's prior representation of RPE/EPMI and the Proceeding, (2) because EPMI

has not met the substantial relationship test, the Court does not need to address the issue of

confidentiality under New York law, (3) the advocate-witness disqualification rules do not

warrant disqualification of Troutman because the testimony to be given by Troutman is not

necessary, and (4) Troutman's failure to seek the EPMI's waiver of a conflict does not constitute

a ground for disqualification under the Virginia Rules of Professional Conduct (the "Virginia

Rules").[1] Further, because the Court has found that disqualification is not warranted, the Court

will not address Troutman's equitable defense based upon the doctrine of laches. Therefore,

EPMI's motion to disqualify Troutman is denied without prejudice.

## I. PROCEDURAL AND FACTUAL HISTORY

Troutman's Prior Representation

Troutman's prior representation extended from July 10, 1995 to July 28, 1997. On June

13, 1987, SJE Cogeneration Company, Inc. (the predecessor in interest to RPE), and VEPCO

entered into a Power Purchase and Operating Agreement (the "Original PPA"). The Original

PPA provided that RPE sold and VEPCO purchased the entire electrical capacity and energy

output of the generation facility owed by RPE and located in Richmond, Virginia (the

"Facility").[2] However, disputes arose between RPE and VEPCO regarding certain provisions of

the Original PPA. In mid-July 1995, RPE engaged Troutman for advice concerning the rights

---

[1] The Court considers the Virginia Rules regarding the relationships at issue that occurred before the Debtors filed their chapter 11 petition before the Court.

[2] Joint Applications for Approval of Disposition of Jurisdictional Facilities and for Approval of the Transfer of Wholesale Power Agreement and Application of RPE for Withdrawal of Prior Application dated December 6, 1996 (the "Application to FERC") were filed by Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") on behalf of RPE and Hunton on behalf of VEPCO, at p. 3.

and obligations of RPE and VEPCO under the Original PPA. Troutman wrote three memoranda

for RPE. The first memorandum, dated July 13, 1995, ("Memo 1") and advised by Mr. Stephen

Northup, addresses whether the Original PPA required RPE to maintain its status as a qualifying

facility under the Public Utility Regulatory Policies Act ("PURPA") and whether RPE's failing

to maintain such status would constitute a material breach of the Original PPA under Virginia

law. The second memorandum, dated July 17, 1995, ("Memo 2") and advised both by Mr.

Northup and Mr. Edward Flippen, addresses whether the sale of electricity under the Original

PPA was the sale of "goods" under the Virginia Uniform Commercial Code. The third

memorandum, dated July 17, 1995, ("Memo 3") and advised both by Mr. Northup and Mr.

Flippen, addresses whether the Original PPA required RPE to sell the electrical output of the

Facility exclusively to VEPCO. Troutman also advised RPE in separate occasions concerning

Virginia law regarding preliminary injunctions in the event there was litigation between RPE and

VEPCO under the Original PPA.

In Memo 2 and 3, Troutman acknowledged RPE's concern that VEPCO may cancel the

Original PPA because RPE was having difficulty maintaining the Facility's qualifying facility

status under PURPA. Troutman further stated in Memo 2 and 3 that RPE was engaging in

negotiations with VEPCO in an effort to restructure the Original PPA and had asked Troutman to

evaluate its rights under the Original PPA. However, Vinson & Elkins ("Vinson"), rather than

Troutman, was the counsel to represent RPE in the negotiations with VEPCO and draft the

Original PPA, the Amended Power Purchase and Operating Agreement (the "Amended PPA")

and the Asset Purchase Agreement (the "APA") between RPE and VEPCO. Vinson exchanged

draft contracts with counsel for parties, including VEPCO and its lawyers from Hunton &

Williams ("Hunton") in the restructuring of the Original PPA.

In January 1996, while Troutman continued to represent RPE, it obtained consents from VEPCO and RPE to represent VEPCO on matters in connection with legislation proposed by VEPCO to the 1996 Virginia General Assembly and a litigation unrelated to RPE's interest. Also in 1996, Mr. Flippen, together with other counsel for RPE and VEPCO, filed a Joint Application (the "Application") for RPE/EPMI in obtaining the Commission's approval of the Amended PPA and the APA. On February 25, 1997, the Amended PPA was entered, which provided a business solution to remove the disputes between RPE and VEPCO regarding certain provisions of the Original PPA.

The new arrangement resulted in the acquisition by VEPCO of the Facility under the APA, and the Amended PPA that substantially reduced the Dependable Capacity Payments, shortened the term of the Original Agreement, and provided for sales of capacity and energy by EPMI to VEPCO from sources outside VEPCO's service territory rather than from the Facility.[3] There is a fundamental distinction between the Original PPA and the Amended PPA. Under the Original PPA, EPMI provided power to VEPCO from the Facility, and by contrast, under the Amended PPA, EPMI would provide power to VEPCO from its (EPMI's) market sources (such sources did not include the Facility, now owed by VEPCO).

Subsequently, Troutman advised RPE on environmental and real estate matters relating to the Facility but not related to the Amended PPA. On July 28, 1997, Mr. Flippen advised RPE in an opinion letter (the "Letter") that there was a proceeding before the Virginia State Corporation Commission (the "Commission"), in which VEPCO's Dependable Capacity Payments to EPMI

---

[3] The Amended PPA provided "[VEPCO] with 250 MW of capacity and thus [VEPCO] would have no immediate need for the Facility's capacity after the acquisition. Therefore, [VEPCO] intends to place the Facility in cold reserve temporarily. If a capacity shortage should develop while the Facility is in cold reserve, or if the opportunity to make cost-effective energy sales from the Facility should arise, the Facility would be capable of returning to service within approximately two weeks." *See* the Application to FERC at P.10-11.

under the Amended PPA were subject to review and disallowance, and the proceeding would not

jeopardize the Annual Capacity Payments[4] under the Amended PPA.

The Proceeding

     Troutman's prior representation ended on July 28,1997 and Troutman has not represented

EPMI since then.  In October 2000, Mays merged with Atlanta-based Troutman.  In September

2001, VEPCO engaged Troutman for advice in connection with EPMI's performance and

VEPCO's rights, including termination rights, under the Amended PPA.  VEPCO terminated the

Amended PPA with EPMI in November 2001.  Shortly thereafter, on December 2, 2001, Enron

Corp. and its certain affiliates, including EPMI (collectively, the "Debtors"), filed voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").[5]

     On November 18, 2002, Robert Feldman of EPMI's counsel from Weil, Gotshal &

Manges LLP ("Weil") met with representatives of VEPCO and its lead counsel, Stephen Northup,

at the offices of Troutman in Richmond, Virginia, to discuss the Proceeding.  Mr. Northup, who

was involved in Troutman's prior representation of RPE, is a partner at Troutman.  Troutman has

represented VEPCO with regard to the Amended PPA for over three years.  Following the end of

Troutman's representation of EPMI in 1997, Troutman has not sought consent from EPMI with

respect to its representation, including the Proceeding, of VEPCO.

     On April 5, 2004, EPMI initiated the Proceeding by a Complaint (the "Complaint") for

Declaratory Relief and for Damages as a consequence of VEPCO's alleged breach of the

---

[4] Pursuant to Section 8 of the Amended PPA, VEPCO will pay EPMI each month the sum of $1,937,925 for Dependable Capacity.  (The Amended PPA §8).  Capacity payments are subject to the review and approval by the Commission in general and in expedited rate cases and alternative rate cases.  Virginia Code §56-235.2.  Pursuant to Article 1 of the Amended PPA, Dependable Capacity means 250 MW or, if the context requires, the capacity to deliver energy at an instantaneous rate of 250 MW.  (The Amended PPA Art. 1).

[5] On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases.  The Plan became effective on November 17, 2004.

contracts between VEPCO and EPMI/RPE. In the Complaint, EPMI alleges, among other things, that VEPCO improperly attempted to terminate the Amended PPA without paying EPMI a termination payment required under the agreement. On June 14, 2004, Troutman on behalf of VEPCO filed counterclaims against EPMI, asserting that VEPCO is entitled to certain damages since EPMI had initially and "materially breached" its obligations under the Amended PPA, and VEPCO terminated the Amended PPA as a result of such breach. The issue in the Proceeding is whether VEPCO's obligation to make the Dependable Capacity Payments and EPMI's obligation to make Dependable Capacity available to VEPCO under the Amended PPA should be characterized as consideration for the purchase of the Facility under the APA between EPMI and VEPCO.

Mr. Feldman from Weil and Harlan Murphy, Vice President and Assistant General Counsel for EPMI, assert in their Affidavits that they did not become aware of Troutman's prior representation of RPE/EPMI until November 2004 when an engagement letter signed by Mr. Northup was discovered. On December 8, 2004, EPMI filed the motion to disqualify Troutman as the counsel for VEPCO and primarily argues that (1) the prior representation of RPE/EPMI by Troutman is substantially related to the Proceeding, (2) Troutman had access to privileged information from its prior representation of RPE/EPMI and will use such information to disadvantage EPMI in the Proceeding, (3) Troutman violates the advocate-witness rules of the NY Code because individual attorneys at Troutman may be fact witnesses in the Proceeding, and (4) after it ceased its prior representation of RPE/EPMI, Troutman has not sought the consent from EPMI regarding its representation, including the Proceeding, of VEPCO.

On December 16, 2004, Troutman filed an opposition to EPMI's motion for disqualification, asserting that (1) EPMI has failed to meet the substantial relationship test, (2)

Troutman did not have access to privileged information regarding EPMI/RPE that is material to

the current Proceeding, (3) EPMI has failed the necessity test under the advocate-witness rules of

the NY Code, and (4) the extraordinary delay by EPMI in seeking disqualification and the danger

of significant prejudice to VEPCO warrant denial of EPMI's motion to disqualify.

An in camera hearing on this matter was held on January 6, 2005 ("Hearing").  The

Hearing was held in camera because some of the material to be presented was under seal to

preserve the attorney-client privilege.

## II. DISCUSSION

### A.    Disqualification Test

Pursuant to Disciplinary Rule 4-101 of the NY Code,[6] a lawyer should preserve the

confidences and secrets of a client.  Disciplinary Rule 5-108(a) of the NY Code[7] provides that

a lawyer who has represented a client in a matter shall not, without consent of the former

client after full disclosure:

> (1)    Thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client.
>
> (2)    Use any confidences or secrets of the former client except as permitted by DR 4-101(c) [e.g., when the client consents] or when the confidence or secret has become generally known.

NY CLS JUD APPX CODE PROF RESP DR 5-108 (2005).

"The objective of the disqualification rule is to 'preserve the integrity of the adversary

process.'" *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983) (citing *Bd. of Educ. of*

*the City of N. Y.  v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).  In attorney disqualification

matters, a court ". . . must be solicitous of a client's right freely to choose his counsel--a right

---

[6] NY. CLS. JUD. APPX. CODE. PROF. RESP. DR 4-101 (2005).
[7] NY. CLS. JUD. APPX. CODE. PROF. RESP. DR 5-108 (2005).

which of course must be balanced against the need to maintain the highest standards of

profession." *Id.* (citing *Gov't of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir. 1978)).

Nonetheless, in the Second Circuit motions to disqualify counsel have long been disfavored.

*Agilent Techs., Inc., v. Micromuse, Inc.,* 2004 WL 2346152, at *9 (S.D.N.Y. 2004) (citing

*Evans*, 715 F.2d at 791-92, (enumerating the reasons for which disqualification motions are

disfavored)); *Bennett Silvershein Assoc. v. Furman*, 776 F.Supp. 800, 802 (S.D.N.Y. 1991).

The Second Circuit also holds the position that the moving party who seeks to disqualify his

former counsel must meet a high standard of proof. *Gov't of India*, 569 F.2d at 739. The

appearance of impropriety alone does not warrant disqualification. *Nyquist*, 590 F.2d at

1246-47.

Further, the Second Circuit held that an attorney may be disqualified from

representing a client if the following three-prong test is satisfied (1) the moving party is a

former client of the adverse party's counsel, (2) there is a substantial relationship between the

subject matter of the counsel's prior representation of the moving party and the issues in the

present lawsuit, and (3) the attorney whose disqualification is sought had access to, or was

likely to have had access to, relevant privileged information in the course of his prior

representation of the client. *Evans,* 715 F.2d at 791.

Troutman does not dispute that RPE is a former client and EPMI, as the successor entity

to RPE, was the beneficiary of certain legal services rendered primarily to RPE. Nor, for

purpose of a disqualification analysis, does Troutman dispute that EPMI is considered a "former

client" of Troutman. However, Troutman denies that it directly represented EPMI except for one

occasion, in which it signed the Application on behalf of EPMI submitted jointly by RPE and

VEPCO for the Commission's approval. Troutman asserts that the reason it signed the

9

Application on behalf of EPMI was because a representative of VEPCO informed Troutman that it should sign the application on behalf of EPMI, as well as on behalf of RPE. Regardless of its denial of its direct representation of EPMI, Troutman agrees that the first prong of the *Evans* test is met because EPMI is the successor of RPE. However, Troutman contests the second and third prong of the *Evans* test. As to the second prong, specifically, it disputes that there is a substantial relationship between the subject matter of Troutman's prior representation and the issue in the Proceeding. As to the third prong, it denies that it had access to or was likely to have had access to EPMI's privileged information.

Regarding the second prong, the Second Circuit has held that disqualification is granted only upon a showing that the relationship between issues in the prior and present cases is "patently clear." *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 754-56 (2d Cir. 1975). "It is the congruence of factual matters, rather than areas of the law, that establishes a substantial relationship between representations for disqualification purposes." *U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1459-60 & n. 25 (S.D.N.Y. 1985). Disqualification has been granted by the Second Circuit only when the issues involved have been "identical" or "essentially the same." *Gov't of India*, 569 F.2d at 740; *NCK Org., Ltd. v. Bregman*, 542 F.2d 128, 135-36 (2d Cir. 1976); *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 572 (2d Cir. 1973).

The Second Circuit in *Gov't of India* concluded that the counsel should be disqualified because he was involved in the identical issue in two proceedings. 569 F.2d at 737. In *Gov't of India*, the issue of the counsel's prior representation of Cook Industries, Inc. (the "Cook") in the first proceeding, a grain company, arose out of shortage of shipped grain under a contract between the Cook and the Government of India ("India") in 1973. *Id.* at 739. Subsequently, in

1976, the counsel represented India against the Cook in a lawsuit which India alleged that the grain delivered pursuant to the contracts with Cook was of "short weight."  *Id.*  "A central allegation [in the second proceeding], as in the earlier action, is that the amounts of grain actually delivered differed from the amounts stated on the weight certificates."  *Id.*  Similarly, the Second Circuit in *Emle* held that the counsel was disqualified when the identical issue was involved in two actions.  478 F.2d at 562.  In *Emle*, the issues of the control of Patentex by Burlington, a part owner of Patentex, and the business relationships between Patentex and Burlington were present both in the counsel's prior representation and in the subsequent proceeding.  *Id*. at 570.

The Court's factual analysis in this matter begins with the facts and circumstances surrounding Troutman's prior representation of RPE/EMPI.  This is essential because ultimately the Court must determine whether the issue in the Proceeding is "identical" or "essentially the same" as the one that was undertaken by Troutman during its prior representation of RPE/EPMI.  There is no doubt that Troutman advised RPE about the Dependable Capacity Payments.  However, the Court's analysis goes deeper because the issue of disqualification does not center around the Dependable Capacity Payments per se.  Rather, it concerns whether any of the issues involved in Troutman's prior representation of EPMI impact the characterization of the Dependable Capacity Payments regarding the purchase of the Facility, which is the issue in the Proceeding.

(1)      EPMI argues that Troutman's prior representation of RPE/EPMI, including the involvement in the restructuring of the Original PPA and the Amended PPA between EPMI and VEPCO, in addition to advice regarding the Dependable Capacity Payments and regulatory approval by the Commission, involves the exact subject matter at issue in the Proceeding.  As referenced previously, in mid-July 1995, Troutman prepared three memoranda for RPE

concerning the rights and obligations of RPE and VEPCO under the Original PPA.  In Memo 1, Troutman advised RPE that the Original PPA did not explicitly require RPE to maintain a qualifying facility status and EPMI's failing to maintain such status would probably not constitute a material breach of the Original PPA under Virginia law.  In Memo 2, Troutman advised RPE that the sale of electricity under the Original PPA was not likely to be considered the sale of "goods" under the Virginia Uniform Commercial Code.  In Memo 3, Troutman advised RPE that the Original PPA did not require RPE to sell the electrical output of the Facility exclusively to VEPCO.  At the time when Troutman prepared Memo 2 and 3, EPMI represented by Vinson, was engaging in negotiations with VEPCO in an effort to restructure the Original PPA, and RPE was concerned that VEPCO may cancel the Original PPA because RPE was having difficulty maintaining the Facility's status of qualifying facility under PURPA.  Troutman also advised RPE on other occasions concerning Virginia law regarding preliminary injunctions in the event there was litigation between RPE and VEPCO under the Original PPA.

　　　RPE filed the Waiver Application before the Federal Energy Regulatory Commission ("FERC"), seeking (1) a determination that the Facility complied with the qualifying facility efficiency standard during 1994, or if necessary, a waiver of such standard for 1994, (2) a waiver of the qualifying facility efficiency standard for the years 1991-93.[8]  VEPCO opposed the relief sought by RPE in the Waiver Application and stated that it would intervene in the FERC proceeding in opposition to RPE's requests if the restructuring of the Original PPA was not approved by the FERC or other regulatory agencies.[9]  The issues addressed in these memoranda became moot when a "handshake deal" that resulted in the restructure of the Original PPA was reached by RPE and VEPCO in August of 1995.  Even though Troutman did not represent RPE

---

[8]  See the Application to FERC, at P. 13-25.
[9]  *Id.*

on the restructuring of the Original PPA, its advice in three memoranda and the issue regarding preliminary injunctions may have impacted the negotiations that resulted in the Amended PPA and the APA. As mentioned previously, there is a fundamental distinction between the Original PPA and the Amended PPA. Under the Original PPA, EPMI provided power to VEPCO from the Facility, and by contrast, under the Amended PPA, EPMI would provide power to VEPCO from its (EPMI's) market sources. Because of this important distinction between the two agreements, although Troutman gave advice on the rights and obligations under the Original PPA, the Court must examine whether such advice is substantially related to the Amended PPA. Based on the evidence presented, the Court finds that such advice from Troutman does not involve "identical" or "essentially the same" issue, that is, the characterization of the Dependable Capacity Payments.

(2)    EPMI alleges that Troutman reviewed the drafts of the Amended PPA, together with the counsel from EPMI and VEPCO, in assisting RPE/EPMI in obtaining state regulatory approval of the restructuring of the Original PPA. The regulatory approval by FERC and the Commission was essential to settle the disputes between RPE/EPMI and VEPCO, and conclude the Amended PPA and the APA. The new arrangement resulted in the acquisition by VEPCO of the Facility and the Amended PPA that substantially reduced the Dependable Capacity Payments, shortened the term of the Original Agreement, and provided for sales of capacity and energy by EPMI to VEPCO from EPMI's market sources rather than from the Facility. EPMI does not dispute the fact that, based upon the facts as they currently appear, Vinson and Hunton, rather than Troutman, drafted the Application to the Commission and the essential terms of the restructuring of the Original PPA which had been agreed by RPE/EPMI and VEPCO and their attorneys before Troutman started to assist in obtaining regulatory approval.

Troutman advised the parties concerning language in the drafts of the Amended PPA and the APA that would impact obtaining state regulatory approval of the two agreements. More specifically, Troutman reviewed the drafts of the Application, gave input concerning language necessary to obtain the Commission's approval and signed the Application. There is no evidence presented that whatever understanding the parties may have had regarding the characterization of the Dependable Capacity Payments in the sale was shared with Troutman. Troutman argues that its role in the Application was limited to verify that the language was consistent with the Commission's regulatory approval requirement. Troutman further argues that there were no client confidences communicated with the draft contracts because Vinson freely distributed draft contracts with counsel and business personnel for all parties to the restructuring of the agreements, including VEPCO and its lawyers. Troutman, together with the counsel for VEPCO, was on this distribution list. In Novmber 1996, the Commission approved the application of RPE/EPMI and VEPCO and ordered that (1) VEPCO be granted a certificate of public convenience and necessity to purchase the Facility from RPE, (2) be authorized to enter into the Amended PPA, and (3) be directed to charge capacity payments made pursuant to the Amended PPA to FERC Account 555, subject to the capacity deferral mechanism.[10]

The Court agrees that the regulatory approval process may be related to the Proceeding because EPMI may discover information regarding what VEPCO told the Commission in the process of obtaining such approval with respect to the characterization of the Dependable Capacity Payments. However, the Application does not directly relate to the characterization of the Dependable Capacity Payments from the prospective of the purchase price. In the

---

[10] Final Order in Case No. PUE960092 made by Commonwealth of Virginia State Corporation Commission dated Nov. 19, 1996 concerning Application of Virginia Electric and Power Company for a certificate of public convenience and necessity pursuant to Va. Code § 56-265.2 and Joint Application of Virginia Electric and Power Company, Richmond Power Enterprise, L.P., and Enron Power Marketing, Inc. for authority to enter into a purchased power contract without competitive bidding.

Application, RPE/EPMI and VEPCO, among the others, filed with the Commission that VEPCO

proposed to acquire the Facility from RPE, for a cash consideration of $20 million.  They further

requested the Commission to approve the proposed accounting treatment of the Dependable

Capacity Payments by setting forth the following reasons:  "[u]nder the terms of the Amended

[PPA], EPMI will supply power from its market sources.  The capacity charges specified in the

Amended [PPA] assure the availability of this source of power.  Thus the capacity payments paid

under the Amended [PPA] should, like other capacity payments to non-utility generators, be

charged to FERC Account 555, Purchased Power, subject to the capacity deferral mechanism."[11]

Mr. Flippen in his Affidavit asserts that his input in the Application was confined to advice

concerning language necessary to obtain the Commission's approval.  *See* Decl. Of Edward

Flippen, P. 3-6.

        Even if Mr. Flippen's language input was included the mentioned cash consideration and

accounting treatment in the Application, based upon the facts as presented, the Court finds that

no evidence indicates that Troutman rendered any opinions on the characterization of

consideration to be paid regarding the purchase of the Facility.  As to the cash $20 million

consideration for the Facility, the Application does not provide other information that is not

included in the section 2.3 of the APA.[12]  Moreover, EPMI does not establish that the proposed

accounting treatment in the Application impacts the issue in the Proceeding regarding the

characterization of the Dependable Capacity Payments.  It is EPMI's burden to prove that the

proposed accounting treatment is linked with the characterization of the Dependable Capacity

Payments.  The proof of such linkage would lead to an inference that Troutman actually advised

---

[11] Application of VEPCO and Joint Applications of VEPCO, RPE and EPMI, dated June 7, 1996 were filed by Mays
on behalf of RPE and EPMI and Hunton on behalf of VEPCO, at p. 3-9.

[12] Section 2.3 of the APA provides "[s]ubject to the terms and conditions of this Agreement and in consideration of
the transactions described in Section 2.1, at the Closing Buyer shall assume the Assumed Obligations and shall pay
to Seller the aggregate amount of $20,000,000 (the "Purchase Price")."  See the APA § 2.3.

RPE/EPMI the characterization of the Dependable Capacity Payments regarding the purchase of the Facility.  However, such linkage was not established.

In response to Troutman's assertion that its prior representation was limited because Vinson represented RPE on the Original PPA and the restructuring of the Original PPA, EPMI argues that clients may have two lawyers at a time and both lawyers are often engaged to help with one problem.  Here, EPMI reasons that Troutman and Vinson were attorneys of RPE/EPMI who were involved in the restructuring of the Original PPA, and Vinson negotiated with VEPCO on behalf of RPE/EPMI and drafted the Amended PPA and the APA; accordingly, from the prospective of the general practice in legal profession, Troutman's prior representation is substantially related to the current Proceeding.

The Court agrees with basic premise that more than one counsel may be so involved in resolution of a particular issue such that each could be conflicted even though only one may have drafted the particular document at issue.  However, "disqualification based on mere speculation [by the movant of disqualification] will not suffice."  *Int'l Union v. Nat'l Caucus of Labor Comms.*, 466 F.Supp. 564, 570 (S.D.N.Y. 1979), *aff'd mem.,* 607 F.2d 966 (2d Cir. 1979).  EPMI "must meet a high standard of proof," *Gov't of India.,* 569 F.2d at 739, for disqualification of a counsel.  For instance, EPMI would have to present evidence that Troutman and Vinson indeed worked together, or that Troutman helped Vinson to advise RPE/EPMI regarding the characterization of the Dependable Capacity Payments.  The Court finds that EPMI has failed to meet such high burden.  By contrast, Troutman's attorney, Edward Flippen, in his Declaration, denies any representation about the Dependable Capacity Payments pursuant to the Amended PPA aside from what was said about those payments in the Application drafted by Vinson and the counsel of VEPCO during his assistance of obtaining the Commission's approval, and asserts

16

that his knowledge about the Dependable Capacity Payments is limited to the description of them

in the Application drafted by Vinson and the counsel of VEPCO.  He further declares his role in

assisting in the Commission's regulatory approval process was as follows:

> I reviewed some drafts of the APA and the Amended PPA
> circulated to representatives of both [RPE and VEPCO], and
> *advised the parties concerning language in the drafts* that I felt
> would impact obtaining state regulatory approval of the
> [r]estucturing. Aside from those reviews, I had no role in preparing
> the APA or the Amended PPA. [Vinson] represented RPE in
> connection with the drafting of those documents.  I was not in a
> position to access the confidences of [RPE/EPMI] . . . I reviewed
> drafts of a Application by RPE/EPMI and VEPCO to the
> [Commission] for approval of the [r]estructuring.  *My input to the*
> *Application was confined to advice concerning language necessary*
> *to obtain [the Commission's] approval.*  On June 6, 1996, I signed
> the Application on behalf of RPE/EPMI and VEPCO. . . To my
> knowledge *no one else* from Troutman *advised* RPE concerning
> those capacity payments.

Decl. of Edward Flippen, P. 3-6 (emphasis added).  Based on the evidence presented above, the

Court finds that such advice from Troutman does not involve the "identical" or "essentially the

same" issue, that is, the characterization of the Dependable Capacity Payments.

> (3)    Edward Flippen acknowledges that Troutman rendered an opinion regarding

the Dependable Capacity Payment in the Letter after the consummation of the Amended PPA

in 1997.  Troutman advised RPE in the Letter that VEPCO's Dependable Capacity Payments

to RPE/EPMI under the Amended PPA were subject to review and disallowance before the

Commission's proceeding, and the proceeding would not jeopardize the Annual Capacity

Payments under the Amended PPA.  Troutman argues that it advised RPE on the potential

impact of a VEPCO rate case upon RPE/EPMI's receipt of capacity payments under the

Amended PPA.  The background section of the Letter states that the Commission's

proceeding was a comprehensive investigation of VEPCO's rates and charges . . .   VEPCO's

present rates are subject to refund as of March 1, 1997 . . . ." Troutman further explains that

neither RPE or EPMI was the party to the rate case, and the Letter as drafted in the context of

a pending utility rate case filed by Dominion Virginia Power with the Commission was not

within the framework of the contract restructuring of the Original PPA, the Amended PPA, or

the APA.

There is no dispute that Troutman referenced in the Letter the same capacity payments

and the same contract that the parties are litigating in the Proceeding. Nevertheless, the Court

finds that in the Letter, Troutman did not discuss the issue in the Proceeding concerning

whether the Dependable Capacity Payments are characterized either as consideration or

deferred payments for the purchase of the Facility under the APA and the Amended PPA. In

the Letter, Troutman was not asked to advise RPE on whether VEPCO's obligation to make

the Dependable Capacity Payments and EPMI's obligation to make dependable capacity

available to VEPCO under the Amended PPA were consideration for the purchase of the

Facility under the APA or any issue related to the consideration dispute. In fact, the

Commission had already approved the Amended PPA and its payment mechanism in

November 1996.[13]

Troutman referred to capacity payments, indemnification, and reimbursement under

the Amended PPA in the section of background information of the Letter, but no opinion on

the characterization of the Dependable Capacity Payments was given by Troutman in this

section and the information received was based on the public filings at the Commission and

the text of the final, executed Amended PPA. The evidence does not support a finding that

Troutman's role in the Letter demonstrates that it advised RPE on the issue concerning the

characterization of the Dependable Capacity Payments under the Amended PPA and the APA.

---

[13] *See footnote 4.*

In addition, EPMI argues that Troutman would be a witness to answer the inquiries of the nature of the Dependable Capacity Payments, including the intention of the parties during the negotiations of the Amended PPA and the APA, if parole evidence would be admissible under the Proceeding.  No evidence presented by EPMI demonstrates that by providing the opinion in the Letter, Troutman would have relevant information regarding the parties' intentions as to the characterization of the Dependable Capacity Payments.

As the Court mentioned previously, the moving party who seeks to disqualify its former counsel must meet a high standard of proof.  *Gov't of India.,* 569 F.2d at 739.  The appearance of impropriety alone does not warrant disqualification.  *Nyquist*, 590 F.2d at 1246-47.  Accordingly, the Court finds that EPMI has failed to meet the high standard of proof that the opinion given by Troutman in the Letter that the Commission's proceeding would not jeopardize the Annual Capacity Payments under the Amended PPA involves the "identical" or "essentially the same" issue in the Proceeding, i.e. the Dependable Capacity Payments are characterized as consideration.  It is EPMI burden to establish Troutman was in a position to advise RPE/EPMI on the characterization of the Dependable Capacity Payment or render the opinion of the Letter based on its advice of such characterization.  Based on the evidence presented above, the Court finds that such advice from Troutman does not involve "identical" or "essentially the same" issue that is the characterization of the Dependable Capacity Payments.

Additionally, EPMI asks the Court not to limit the inquiry on the substantial relationship test to whether, during Troutman's involvement, Troutman provided advice regarding the characterization of the Dependable Capacity Payments because the test is not an "identical" relationship test, but a "patently clear" test.  In support of this proposition, EPMI cites to *Hammond v. Goodyear Tire & Rubber Co*., 933 F. Supp. 197, 201 (N.D.N.Y. 1996).  The case

law in the Second Circuit has well established that disqualification has been granted only when the issues involved have been "identical" or "essentially the same." *Gov't of India*, 569 F.2d at 740; *Bregman*, 542 F.2d at 135-36. The "patently clear" test in *Hammond* is equivalent to "essentially the same." *Hammond*, 933 F. Supp. at 201. In *Hammond,* the counsel represented a wheel assembly manufacturer in a lawsuit concerning personal injuries. Subsequently, the counsel represented Daryl Hammond, who had been injured, to sue this manufacturer. Both representations involved the same product, i.e. the multi-piece rim assembly, the same legal theories, i.e. strict product liability and negligence, and the same claims "which assert that the multi-piece wheel was defectively designed and capable of explosively separating under pressure." *Id.* Thus, the *Hammond* court found that a "substantial relationship" was established because the two representations by the counsel were essentially the same. *Id.* The Court finds that *Hammond* is factually distinguishable from the instant case. The instant case does not involve the same issue or the same legal theory as those in Troutman's prior representation according to the Court's previous findings.

The Court further finds that *Agilent* is factually analogous to the instant case. The court in *Agilent* denied the motion for disqualification because the plaintiff failed to meet the high burden with respect to establishing the existence of a "substantial relationship." 2004 WL 2346152 at *10-11.

> The counsel in *Agilent* during its five-year relationship with Network Harmoni, [an entity acquired by Micromuse], represented Network Harmoni in its corporate affairs, employment issues, in prosecuting its patents and trademarks and handling other patent and trademark-related matters, in evaluating third-party patents, and in drafting and negotiating licensing agreements, financing instruments and other corporate-related documents . . . The counsel is alleged to have drafted and filed several patent applications with the United States Patent and Trademark Office relating to certain aspects of Network Harmoni's suite of proprietary intelligent

> software agents, as well as the company's plans for future software applications and services . . . The counsel represented Network Harmoni in its negotiations to be purchased by Micromuse, and Network Harmoni and Micromuse executed a non-disclosure agreement to assure that the parties could have full and complete discussions without the use of such information for non-acquisition purposes.

The *Agilent* court did not find that the proof of substantial similarity between the above counsel's prior representation and the issue in the present lawsuit was "patently clear" to warrant disqualification. *Id.* at *10-12. That court found that prior general business representation by the counsel evidenced above was unrelated to the lawsuit at issue, in which the plaintiff must show that "the counsel gave Network Harmoni advice on the validity of the patents in suit, including whether there was infringement by Network Harmoni of the patents in suit." *Id.*

Here, Troutman advised RPE of its rights and obligations under the Original PPA, rendered a Letter opinion to RPE concerning the Dependable Capacity Payments, advised RPE on environmental and real estate matters relating to the Facility but not related to the Amended PPA, and assisted RPE/EPMI in obtaining the Commission's regulatory approval of the Amended PPA. However, "a lawyer who merely observed the negotiations and reviewed draft agreements need not be disqualified." *Paretti v. Cavalier Label Co., Inc.,* 722 F. Supp. 985, 986 (S.D.N.Y. 1989) (citing *Am. Special Risk Ins. Co. v. Delta Am. Re Ins. Co.,* 634 F.Supp. 112, 122 (S.D.N.Y. 1986)). EPMI fails to present sufficient evidence to demonstrate Troutman gave advice, through its prior representation of RPE/EPMI, on the nature of the Dependable Capacity Payments regarding the consideration provided for the purchase of the Facility, which is the issue at the current Proceeding. There is not a clear "factual overlap" in the two Troutman's representations involved. Therefore, the Court concludes, as stated previously, that EPMI has

failed to meet the high burden of establishing the "substantial relationship" in the two

representations.

Because EPMI has failed to satisfy the second prong of the *Evans* test required for

disqualification of Troutman from representing VEPCO in the Proceeding, the Court does not

need to address the third prong of the *Evans* test on whether Troutman had access or was likely

to have had access relevant privileged information from its prior representation.  To preserve the

integrity of the adversary process and maintain high standards of profession, the Court denies the

motion to disqualify without prejudice.  EPMI may refile the motion to disqualify, if the

discovery in the Proceeding demonstrates additional facts establishing that the counsel's prior

representation of RPE/EPMI dealt with the "identical" or "essentially the same" issue presented

in the Proceeding.

**B.    The Advocate-witness Disqualification Rules**

The advocate-witness disqualification rules provide that (1) "[a] lawyer shall not act, or

accept employment that contemplates the lawyer's acting, as an advocate on issues of fact before

any tribunal if the lawyer knows or it is obvious that the lawyer ought to be called as a witness

on a significant issue *on behalf of the client*,"[14] and (2) "[n]either a lawyer nor the lawyer's firm

shall accept employment in contemplation or pending litigation if the lawyer knows or it is

obvious that the lawyer or another lawyer in the lawyer's firm may be called as a witness on a

significant issue *other than on behalf of the client*, and it is apparent that the testimony would or

might be prejudice to the client."[15]  (emphasis added).

The advocate-witness disqualification rules under the NY Code "provide guidance, not

binding authority, for courts in determining whether a party's law firm, at its adversary's

---

[14] NY. CLS. JUD. APPX. CODE. PROF. RESP. DR 5-102 (A) (2005).
[15] NY. CLS. JUD. APPX. CODE. PROF. RESP. DR 5-102 (B) (2005).

instance, should be disqualified during litigation." *S&S Hotel Ventures Ltd. P'ship*, v. *777 S. H. Corp.,* 69 N.Y.2d 437 (App. Div. 1987). "Courts must, in addition, consider such factors as the party's valued right to choose its own counsel, and the fairness and effect in the particular factual setting of granting disqualification or continuing representation." *Id.* "Disqualification may be required only when it is likely that the testimony to be given by the witness is necessary." *Id.* at 438.

EPMI seems to acknowledge that the test of necessity under the advocate-witness rules is appropriate by citing *Sokolow, Cunaud, Mercadier & Carreras LLP v. Lacher*, 747 N.Y.S.2d 441, 449 (App. Div. 2002). However, EPMI has failed to present a convincing arguments as to why Troutman's testimony is necessary in the Proceeding. Instead, EPMI argues that the attorneys may well provide testimony against the interests of VEPCO because they are key fact witness in the Proceeding to craft the Application. EPMI explains that the presentation of evidence of certain representations by VEPCO to the Commission will likely explore the recollection of Troutman's attorneys regarding whether the parties discussed arguments to be made to the Commission concerning the Dependable Capacity Payments.

The New York state case law has well established that testimony may be relevant and even highly useful but such testimony is still not strictly necessary. *S&S Hotel Ventures Ltd. P'ship*, 69 N.Y.2d at 438. In the second circuit, a lawyer may be not disqualified if his testimony will merely corroborate other testimony. *MacArthur v. Bank of N.Y.,* 524 F. Supp. 1205, 1208-09 (S.D.N.Y. 1981). "A finding of necessity takes into account such factors as the significance of the matters, weight of the testimony, and availability of other evidence." *S&S Hotel Ventures Ltd. P'ship*, 69 N.Y.2d at 446. (citing, *see, Comden v. Superior Ct.,* 20 Cal 3d 906, 576 P2d 971, *cert denied* 439 US 981; *see also, Universal Athlete Sales Co. v American Gym, Recreational &*

*Athletic Equip. Corp.,* 546 F2d 530, 538-39, n 21, *cert denied* 430 US 984; *Foster Wheeler Corp.*

*v Babcock & Wilcox Co.,* 440 F Supp 897, 903)).  Therefore, the Court turns to evaluate

Troutman's role in its prior representation and other available testimony in order to determine

whether Troutman's testimony would be "necessary" in the Proceeding.

  As the Court mentioned previously, in the second circuit, a lawyer who merely observed

the negotiations and reviewed draft agreements need not be disqualified.  In this circuit, a lawyer

ought to testify on behalf of his client when a lawyer drafts an ambiguous document for a

layperson and the lawyer may be the only witness capable of explaining the ambiguity.  *Paretti,*

722 F.Supp. at 986 (citations omitted).  A lawyer must be disqualified under the circumstance

that he negotiates, executes, and administers a contract and is the key witness at trial.  *Id.*

(citations omitted).  The Court finds that these situations that warrant the grant of motion to

disqualify are not applicable in the instant case.

  Here, Troutman is not the only witness that can provide accounts of the negotiations and

discussions between RPE/EPMI and VEPCO in the restructuring of the Original PPA and during

the process of the Commission's approval on such restructuring.  The Court notes that the

attorneys and other senior business staffs who worked on related matters of the restructuring for

EPMI/RPE and VEPCO are instrumental to answer EPMI's inquiry regarding the

characterization of the Dependable Capacity Payments.  The attorneys from Vinson, Skadden,

Hunton and the Commission who worked on such matters will also be qualified to be witnesses.

Actually, EPMI has identified these people, apart from the attorneys from Trouman, as witnesses

in the Proceeding pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, as made

applicable through Rule 7026 of the Federal Rules of Bankruptcy Procedure.

Additionally, as the Court discussed previously in the section A of this opinion, Troutman did not negotiate, draft, execute, and administer on the Original PPA, the Amended PPA and the APA.  Troutman rendered opinions of the Original PPA and the Amended PPA based on the drafts of these agreements prepared by Vinson.  No evidence demonstrates that when Troutman assisted in obtaining the Commission's approval, it possessed unique information that would provide additionally important facts in the testimony under the Proceeding, or that EPMI would not be available from other available testimony.  Because of limited roles in its prior representation, Troutman's testimony would likely be to corroborate other testimony.  "An additional corroborative witness would almost always be of some use to a party, but might nevertheless be essentially cumulative."  *MacAuthur*, 524 F.Supp. at 1208-09. Here, no evidence demonstrates that Troutman's role in prior representation is pivotal to provide additionally substantial facts through its testimony.

Disqualification of an attorney is a severe sanction.  EPMI has a heavy burden to provide evidence, which is sufficient to support a reasonable inference that Troutman is a necessary witness in the Proceeding.  The Court needs to balance "not only the ethics of the profession but also the substantial rights of the litigants."  *S&S Hotel Ventures Ltd. P'ship*, 69 N.Y.2d at 443. Since EPMI has failed to meet such burden, the Court finds that the rules of advocate-witness disqualification do not warrant disqualification of Troutman because the testimony to be given by Troutman is not "necessary".

## C.    Troutman's Failure to Seek EPMI's Waiver of A Conflict

EPMI argues that Troutman should be disqualified because Troutman failed to seek the consent from EPMI for its representation of VEPCO, starting from September 2001 and including its roles in the Proceeding, to waive the conflict.  The issue before the Court is whether

Troutman was obliged to seek such consent and give full disclosure to EPMI of its intended representation of VEPCO prior to commencing such representation.

EPMI fails to provide sufficient legal sources to support that Troutman owes such duty or obligation to EPMI regarding its representation, including the Proceeding, of VEPCO after Troutman ceased its prior representation of RPE/EPMI.  Instead, EPMI cites a waiver letter dated in 1996, in which Troutman sought consent to represent VEPCO in two litigations unrelated to RPE's interests as instructive evidence to prove that Troutman owed such duty to EPMI.  Having reviewed this waiver letter, the Court finds that pursuant to the Rule 1.7 of the Virginia Rules,[16] Troutman was required to obtain consent from RPE because RPE was an "existing client" of Troutman when VEPCO approached Troutman to represent VEPCO in two litigations in 1996, and the representation of VEPCO would be directly adverse to the interest of RPE.

In 2001, when VEPCO engaged Troutman for advice in connection with EPMI's performance and VEPCO's rights, including termination rights, under the Amended PPA, EPMI was a "former client" of Troutman because Troutman's last representation of RPE/EPMI ended on July 28, 1997.  Therefore, Rule 1.7 of the Virginia Rules, a rule regarding an "existing client," did not govern Troutman's representation in September 2001.  Accordingly, the fact that Troutman sought waiver in 1996 is not determinative as to whether a waiver letter was required after July 28, 1997.  Thus, Troutman was not compelled by the waiver letter in 1996 to give the full disclosure of its prior representation of RPE/EPMI and intended representation of VEPCO to EPMI, when EPMI was no longer its "existing client."  To determine whether Troutman was required to obtain consent, the Court must examine the applicable Virginia Rules regarding "former clients."

---

[16] Rule 1.7. provides that "a lawyer shall not represent a client if the representation of that client will be directly adverse to another existing client unless . . . each client consents after consultation."  VA. SUP. CT. R. PT. 6, SEC. II, 1.7 (2005).

Prior to EPMI's filing of its chapter 11 bankruptcy petition, Rule 1.9 of the Virginia Rules governed Troutman's representation of VEPCO in relationship to EPMI as a "former client." Rule 1.9 provides that "a lawyer represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless both the present and former client consent after consultation." [17] The Court finds that Virginia courts have interpreted "substantially related" to mean "identical" or "essentially the same." *Rogers v. Pittston Co.,* 800 F. Supp. 350 (W.D. Va. 1992), *aff'd,* 996 F.2d 1212 (4th Cir. 1993). Based on the Court's previous analysis, EPMI has failed its heavy burden to establish that the two representations by Troutman are "identical" or "essentially the same," which would result in a duty owed by Troutman to seek consent from EPMI under the Virginia Rules.

After EPMI filed its chapter 11 bankruptcy petition, Disciplinary Rule 5-108(a) of the NY Code governs the dispute at issue, which rule the Court has discussed previously in section A of this opinion. Based upon the previous analysis, the Court finds that EPMI has failed its heavy burden to establish the two representations by Troutman are "identical" or "essentially the same," which would result in a duty owed by Troutman to seek consent from EPMI under the NY Code.

Therefore, the Court rejects EPMI's argument that Troutman should be disqualified on the ground Troutman failed to seek consent from EPMI for its representation of VEPCO, once VEPCO became a "former client."

### III.  CONCLUSION

---

[17] VA. SUP. CT. R. PT. 6, SEC. II, 1.9 (A) (2005).

For the foregoing reasons, the Court finds that (1) EPMI has not met the high standard required for disqualification to demonstrate that there exists a substantial relationship between Troutman's prior representation of RPE/EPMI and the Proceeding, (2) the advocate-witness disqualification rules are not applicable in the instant case because the testimony to be given by Troutman is not necessary, and (3) Troutman's failure to seek the EPMI's waiver of a conflict does not constitute a ground for disqualification under Virginia Rules.   Because the Court has found that disqualification is not warranted, the Court will not address Troutman's equitable defense based upon doctrine of laches.   Therefore, the Court concludes that EPMI's motion to disqualification for the counsel of VEPCO is denied without prejudice.

Counsel for VEPCO is directed to settle an order consistent with this opinion.


Dated:  New York, New York
         August 15, 2005


       _s/ Arthur J. Gonzalez_____
       UNITED STATES BANKRUPTCY JUDGE